**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

LAURA O'SULLIVAN,
PATRICIA DAVIES, LYNDA SCELSI,          )
LORI KANE,  MARGARET ELLWEIN,           )
AND JESSICA NEIPRIS,                     )
                                         )
      Plaintiffs,                        )
                                         )          C.A. No. _____
    v.                                 )
                                         )          JURY TRIAL DEMANDED
NEW CASTLE COUNTY;                       )
MATTHEW MEYER individually               )
and in his official capacity as          )
New Castle County Executive;             )
VAUGHN M. BOND, JR., individually        )
and in his official capacity as Chief of )
New Castle County Police;                )
VANESSA S. PHILLIPS, individually        )
and in her official capacity as Chief    )
Administrative Officer;                  )
QUINTON WATSON, individually             )
and in his official capacity as former   )
Lieutenant Colonel; and MICHAEL          )
HOJNICKI, individually and in his        )
official capacity as former Public Safety )
Director.                                )
                                         )
                                         )
      Defendants.                        )

## COMPLAINT

## INTRODUCTION

1.      Plaintiffs, Laura O'Sullivan, Patricia Davies, Lynda Scelsi, Lori Kane, Margaret

Ellwein and Jessica Neipris (collectively "Plaintiffs") file this action against Defendants New

Castle County, ("Defendant NCC"); Matthew Meyer, New Castle County Executive, in his

individual and official capacity; Colonel Vaughn M. Bond, Jr., Chief of the New Castle County

Police Department, in his individual and official capacity; Vanessa S. Phillips, Chief

Administrative Officer, in her individual and official capacity, Quinton Watson, former Lieutenant Colonel for NCC, individually and in his official capacity; and Michael Hojnicki, former New Castle County Acting Public Safety Director, in his individual and official capacity.

## OVERVIEW

2.      In practice, Defendant NCC was a sanctuary for sexual harassers coddling and enabling men in a position of power and authority to abuse female employees and suppress their complaints of sexual harassment and assault. Specifically, Defendant NCC became a home and safe harbor for serial sexual predator Defendant Watson as NCC willfully suppressed, discouraged and ignored any and all complaints of sexual harassment, allowing Defendant Watson to sexually harass multiple women over a course of two decades. Defendant NCC has repeatedly denied all allegations set forth by Plaintiffs in an attempt to cover up years of sexual harassment and a hostile work environment. Multiple policy makers were aware of Defendant Watson's sexual discrimination and harassment of females yet Defendant NCC continued to turn a blind eye towards Defendant Watson's conduct and continue to promote and empower him over his female subordinates. Defendant NCC's tolerance of Defendant Watson's conduct created a sanctuary for sexual harassment within the NCC Police Department. As a result of Plaintiffs' treatment by Defendants, Plaintiffs have suffered humiliation, emotional anguish, derailment of their professional careers, and significant loss of economic opportunities.

## JURISDICTION

3.      This Court has federal question jurisdiction over this cause of action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

4.      This Court has supplemental jurisdiction over all state causes of action pursuant to 28 U.S.C. §1367.

2

5.      Venue is proper in this District pursuant to 29 U.S.C. § 1331, as well as 28 U.S.C. § 1391(b).

## PARTIES

6.      Plaintiff Laura O'Sullivan ("Plaintiff O'Sullivan") is a resident of New Castle County, Delaware, who at all times relevant to this Complaint was an employee of Defendant NCC. Plaintiff O'Sullivan began her employment with Defendant NCC in 1993 and currently holds the rank of Captain.

7.      Plaintiff Patricia Davies ("Plaintiff Davies") is a resident of New Castle County, Delaware, who at all times relevant to this Complaint was an employee of Defendant NCC. Plaintiff Davies began her employment with Defendant NCC in 1994 and currently holds the rank of Captain.

8.      Plaintiff Lynda Scelsi ("Plaintiff Scelsi") is a resident of New Castle County, Delaware, who at all times relevant to this Complaint was an employee of Defendant NCC. Plaintiff Scelsi began her employment with Defendant NCC in 1994 and held the position of Police Officer until July 15, 2019.

9.      Plaintiff Lori Kane ("Plaintiff Kane") is a resident of New Castle County, Delaware, who at all times relevant to this Complaint was an employee of Defendant NCC. Plaintiff Kane began her employment with Defendant NCC in 2003 and currently holds the position of Budget and Procedures Analyst.

10.     Plaintiff Margaret Ellwein ("Plaintiff Ellwein") is a resident of New Castle County, Delaware, who at all times relevant to this Complaint was an employee of Defendant NCC. Plaintiff Ellwein began her employment with Defendant NCC in 1989 and currently holds the position of Background Investigator.

3

11.     Plaintiff Jessica Neipris ("Plaintiff Neipris") is a resident of New Castle County, Delaware, who at all times relevant to this Complaint was an employee of Defendant NCC. Plaintiff Neipris began her employment with NCC in 2010 and currently holds the position of Corporal.

12.     Defendant New Castle County ("Defendant NCC") is located at the New Castle County Government Center, 87 Reads Way, New Castle, Delaware, 19720, and is subject to service of process at 87 Reads Way, New Castle, Delaware 19720.

13.     Defendant Matthew Meyer ("Defendant Meyer"), the County Executive for New Castle County, is being sued in his official and individual capacity and is subject to service of process at 87 Reads Way, New Castle, Delaware, 19720.

14.      Defendant Vaughn M. Bond, Jr. ("Defendant Bond") the Chief of Police for the New Castle County Police Department, is being sued in his official and individual capacity and is subject to service of process at the Public Safety Building, 3601 North DuPont Highway, New Castle, Delaware, 19720.

15.     Defendant Vanessa S. Phillips ("Defendant Phillips") is currently the Chief Administrative Officer ("CAO") of NCC and formerly held the position of Chief Human Resource Officer. Defendant Phillips is being sued in her official and individual capacity and is subject to service of process at the New Castle County Government Center, 87 Reads Way, New Castle, Delaware, 19720.

16.     Defendant Michael Hojnicki ("Defendant Hojnicki") is currently the Chief of Technology & Administrative Services of NCC and formerly held the position of Public Safety Director. Defendant Hojnicki is being sued in his official and individual capacity and is subject to

service of process at the New Castle County Government Center, 87 Reads Way, New Castle, Delaware, 19720.

17.     Defendant Quinton Watson ("Defendant Watson"), former Lieutenant Colonel of NCC, is being sued in his official and individual capacity.

## FACTUAL ALLEGATIONS

**NEW CASTLE COUNTY'S CULTURE OF MISOGYNY ABUSES, HARASSES, SILENCES, AND DESTROYS THE CAREERS OF WOMEN**

18.     Using his position of power at NCC, Defendant Watson set workplace precedent and spawned a hostile environment of rampant sexual harassment, sexual assault, overt misogyny, and retaliation among female employees within the NCC government. Defendant Watson normalized the practice of preying on subordinate female employees which Defendant NCC covered up for years, allowing Defendant Watson, as an abuser, to thrive.

19.     Defendant Watson's behavior included blatant acts of sexual harassment and assault, but also took the form of more subtle forms of harassment including, *inter alia*, gawking, sexual gestures and sounds, and displaying himself in a sexually suggestive and aggressive manner.

20.     Defendant NCC's ignorance of Defendant Watson's discriminatory behavior empowered him, which in turn created a sexually hostile work environment and allowed him to sexually harass numerous women for over twenty years.

21.     Defendants Bond, Meyer, and Phillips, played an active role in condoning, perpetuating, and covering up the rampant incidents of sexual harassment and sexual assault at NCC.

22.     As a general pattern and practice, Defendant NCC stood behind Defendant Watson, despite conduct and comments that can only be described as sexist, misogynistic, and discriminatory.

23.     Defendants remained silent even though multiple NCC employees, including Plaintiffs reported Defendant Watson's sexual harassment and assault. Defendants also continued to support Defendant Watson, allowing him to be promoted through the ranks of the police department.

**DEFENDANT WATSON SEXUALLY HARASSES PLAINTIFF LAURA O'SULLIVAN**

24.     Defendant Watson began to sexually harass Plaintiff O'Sullivan in 1996 which continued throughout her employment with Defendant NCC. Defendant Watson made numerous comments to Plaintiff O'Sullivan about her appearance, hair, good shape, hard body and ass.

25.     Defendant Watson sent Plaintiff O'Sullivan a three page sexually graphic and explicit letter describing what he wanted to do with her and signed it "Q." In the letter, Defendant Watson wrote he wanted to grab Plaintiff O'Sullivan's ponytail, bend her over and stick his big black cock inside of her. Watson confronted Plaintiff O'Sullivan a day or two later and asked Plaintiff O'Sullivan what she thought about his letter and asked what she did to herself when she read it.

26.      Defendant Watson told Plaintiff O'Sullivan he wanted to slide into her vagina, ass, and even in her mouth. Defendant Watson repeated to Plaintiff O'Sullivan how he wanted her to suck his penis and how he would then slide his penis in between her breasts.

27.      For multiple years Defendant Watson sent Plaintiff O'Sullivan departmental pages stating he wanted to stick his big black cock inside of her, and further describing how he wanted her to suck his big black cock.

28.     Defendant Watson sent Plaintiff O'Sullivan approximately sixty sexually explicit and inappropriate messages on her departmental pager.

29.     During a New Castle County Police Department holiday party, Defendant Watson grabbed Plaintiff O'Sullivan's hand, pulled it to his penis and said this is how hard you make my dick.

30.     Defendant Watson called Plaintiff O'Sullivan into his office, had ordered her around the back of his desk and then reached up from behind and grabbed her crotch and buttocks.

31.     Plaintiff O'Sullivan was also subjected to Defendant Watson gawking, displaying himself in a sexually explicit matter to exert dominance, and sexual noises and stares during her employment.

32.     Defendant Watson ordered Plaintiff O'Sullivan into his patrol car and confronted her about her reports of sexual harassment and assault.

33.     On more than one occasion, Defendant Watson told Plaintiff O'Sullivan she should come into the office to work on days in which he knew he would be the only one in the office so he could get her alone.

34.     Plaintiff O'Sullivan feared retaliation if she reported Defendant Watson's discriminatory actions as he held multiple high-ranking positions within the organization.

35.     In 2006, Plaintiff O'Sullivan reported to Defendant Bond, then holding the rank of Lieutenant, she was sexually harassed and assaulted by Defendant Watson for a period of years beginning in 1996 and 2006. Plaintiff O'Sullivan reported to Defendant Bond the acts of sexual harassment and assault as stated herein.

36.     Defendant Bond threatened Plaintiff O'Sullivan stating that she would solely be known for being a victim and this fact alone would dominate her career and reputation.

37.     Defendant Bond failed to take any action to investigate Plaintiff's O'Sullivan's reports of sexual harassment and assault.

**DEFENDANT WATSON SEXUALLY HARASSES PLAINTIFF PATRICIA DAVIES**

38.     Defendant Watson began to sexually harass Plaintiff Davies beginning in 1994 and continuing throughout her employment with Defendant NCC.

39.     Defendant Watson made numerous comments to Plaintiff Davies about how she looked in her gray pants and would always ask her to turn around so he could look at them from the back.

40.     Defendant Watson described to Plaintiff Davies how he wanted to toss her like a salad and put dressing all over her.

41.     Defendant Watson unnecessarily and without consent grabbed Plaintiff Davies through her legs/crotch area and lifted her into a wall during a training scenario.

42.     Defendant Watson put his hands on Plaintiff Davies shoulders and flipped her hair.

43.     Defendant Watson often commented about the size of his genitals in front of Plaintiff Davies.

44.     Defendant Watson often wrote Plaintiff Davies handwritten notes and sent her emails, texts and pages describing inappropriate behaviors and actions he wanted to do with her.

45.     Defendant Watson regularly made comments about the size of his penis, comparing it to the Loch Ness monster.

46.     Defendant Watson took a picture of his lips, gave the picture to Plaintiff Davies and told her what he wanted to do with them, making sexual comments and asked if she would like to kiss his big juicy lips.

47.     Defendant Watson sent Plaintiff Davies post-it notes of penises and made comments to her about coming over to her house to go swimming in her pool in a speedo.

48.     Defendant Watson made it clear to Plaintiff Davies he knew where she lived and that he had driven by her house and watched her through her windows.

49.     Defendant Watson signed one of the numerous notes he sent to Plaintiff Davies "Hannibal." This was during the time Defendant Watson would constantly talk about the movie *Silence of the Lambs* discussing the part at the end of the film when the male put the girl in a hole/basement and stated he would put Plaintiff Davies in a hole, while licking his lips.

50.     Plaintiff Davies was also subjected to Defendant Watson gawking, displaying himself in a sexually explicit matter to exert dominance, and sexual noises and stares during her employment.

51.     Plaintiff Davies feared retaliation if she reported Defendant Watson's discriminatory actions as he was at all relevant times her superior and held multiple high-ranking positions within the organization.

52.     Plaintiff Davies was aware that others in the NCC Police Department had knowledge of Defendant Watson's discriminatory and sexually harassing behaviors, yet no action was taken against Defendant Watson.

**WATSON SEXUALLY HARASSES PLAINTIFF MARGARET ELLWEIN**

53.     Defendant Watson created a sexually hostile work environment by sexually harassing Plaintiff Ellwein beginning in 1999 which continued throughout her employment with Defendant NCC.

54.     While Defendant Watson was Plaintiff Ellwein's immediate supervisor and giving her an annual evaluation, he made sexually explicit comments. Defendant Watson stated to Plaintiff Ellwein she didn't smile enough and if she got laid more often, she would smile more.

55.     Plaintiff Ellwein was also subjected to Defendant Watson gawking, displaying himself in a sexually explicit matter to exert dominance, and sexual noises and stares during her employment.

56.     Plaintiff Ellwein feared retaliation if she reported Defendant Watson's discriminatory actions and sexual harassment as he was at all relevant times her superior and held multiple high-ranking positions within the organization.

**DEFENDANT WATSON SEXUALLY HARASSES PLANITIFF LYNDA SCELSI**

57.     Defendant Watson created a sexually hostile work environment by sexually harassing Plaintiff Scelsi beginning in 1999 which continued through Plaintiff Scelsi's employment with Defendant NCC.

58.      Defendant Watson commented about the size of Plaintiff Scelsi's breast and how they were hidden under her vest. Defendant Bond was present for Defendant Watson's sexually harassing comments and failed to act.

59.     Defendant Watson repeatedly made comments to Plaintiff Scelsi regarding how good her ass looked in certain pants. He constantly lurked, whistled and made sexual noises at her.

60.     While Defendant Watson was conducting a personal inspection of Plaintiff Scelsi, he grabbed her belt with his hand between her shirt and pants and stated her pants are getting tight on her ass, if Anthony (her husband) isn't working her right she should let him know.

61.     Plaintiff Scelsi feared retaliation if she reported Defendant Watson's sexual assault and harassment as he was at all relevant times her superior and held multiple high-ranking positions within the organization.

62.     Plaintiff Scelsi was aware that others in the NCC Police Department had knowledge of Defendant Watson's discriminatory and sexually harassing behaviors, yet no action was taken against Defendant Watson.

**DEFENDANT WATSON SEXUALLY HARASSES PLAINTIFF LORI KANE**

63.     Defendant Watson began to sexually harass Plaintiff Kane in 2004 which continued through Plaintiff Kane's employment with Defendant NCC.

64.     While Plaintiff Kane was on the phone with Defendant Watson inquiring about Safe Street grants, Defendant Watson told her his dick was hard.

65.     While Plaintiff Kane was at NCC headquarters, Defendant Watson told her she should wear those pants more often because her ass in those pants is Mmmmm.

66.     Defendant Watson stated to Plaintiff Kane she looked good since she lost weight and that her clothes were fitting much better.

67.     Defendant Watson stated to Plaintiff Kane, mmm, the things I'd like to do to you on more than one occasion.

68.     Plaintiff Kane was also subjected to Defendant Watson gawking, displaying himself in a sexually explicit matter to exert dominance, and sexual noises and stares during her employment.

69.     Plaintiff Kane feared retaliation if she reported Defendant Watson's act of sexual harassment as he was at all relevant times her superior and held multiple high-ranking positions within the organization.

**DEFENDANT WATSON SEXUALLY HARASSES PLAINTIFF JESSICA NEIPRIS**

70.     Defendant Watson created a sexually hostile work environment by sexually harassing Plaintiff Neipris beginning in 2010 which continued throughout Plaintiff Neipris' employment with Defendant NCC.

71.     On Plaintiff Neipris' first day of the police academy, she was pulled out of the group of recruits by Defendant Watson. Watson then made Plaintiff Neipris "bear crawl" (hands and feet on the floor, body as low as possible, buttocks in the air) in an area adjacent to but completely separate from where all of the other recruits were performing the same exercise, while he stood directly above her.

72.     While passing Defendant Watson, and two other ranking officers Defendant Bond and Lieutenant Treadwell, at New Castle County Police Headquarters, Defendant Watson looked at Plaintiff Neipris, spun his finger around motioning her to turn around in a circle. Defendant Watson then said to her he was just checking to see if she was still polishing her brass.

73.     Defendant Watson again singled Plaintiff Neipris out when he recommended she apply to the Community Services Unit, a unit under his command. Feeling uncomfortable, Plaintiff Neipris reported this and the 'turn around' incident to Sergeant Slayton, who stated it needed to be reported to Lieutenant Smith. Lieutenant Smith told Plaintiff Neipris the situation needed to be officially reported and addressed now because, it will get worse. Lieutenant Smith warned that the situation would progress to her receiving text messages on her personal cell phone from Defendant Watson, implying Defendant Watson had done this before and purposefully singled out particular female officers.

74.     Pursuant to Lieutenant Smith's direction, on December 11, 2013, Plaintiff Neipris filed a memorandum through her New Castle County Police Department chain of command, which

included Defendant Bond, regarding the sexual harassment she endured by way of Defendant Watson. Defendant NCC failed to respond to Plaintiff Neipris' memorandum.

75.     Defendant Bond was a Patrol Captain at the time Plaintiff Neipris filed her memorandum and therefore had a duty to forward Plaintiff Neipris' complaint up the chain of command. Instead, Defendant Bond protected Defendant Watson and failed to address Plaintiff Neipris' complaint.

76.     Plaintiff Neipris was also subjected to Defendant Watson's gawking, displaying himself in a predatory and dominant manner and stares during her employment.

77.     Plaintiff knew it was futile to make any further reports against Watson because Defendant NCC had previously failed to address her complaints.

**DEFENDANT NEW CASTLE COUNTY IGNORED REPORTS OF SEXUAL HARASSMENT AND CONTINUED TO PROMOTE WATSON IN SPITE OF HIS CONTINUED MISOGYNY AND HARASSMENT**

78.     In 2006, Plaintiff O'Sullivan reported to Defendant Bond she was sexually harassed and assaulted by Defendant Watson for a period of years beginning in 1996.

79.     Defendant Watson's sexual harassment of Plaintiff O'Sullivan consisted of sexually charged and abusive remarks, through handwritten letters and notes, electronic messages, via pager, and unlawful sexual contact and assault.

80.     Plaintiff O'Sullivan specifically reported to Defendant Bond that Defendant Watson grabbed her groin and buttocks while she was on duty and she feared retaliation for reporting Defendant Watson due to the fact he was her superior.

81.     Defendant Bond failed to take any action to investigate Captain O'Sullivan's reports of sexual harassment and assault. He failed to make a report to Internal Affairs, the Chief

of Police or Human Resources. Instead Defendant Bond informed Defendant Watson about Plaintiff O'Sullivan's complaints in hopes of suppressing them.

82.     Defendant Watson then confronted Plaintiff O'Sullivan and attempted to intimidate her to stop her from further reporting his discriminatory actions.

83.     Defendant NCC again became aware of Defendant Watson's sexually discriminatory conduct in 2013, when Plaintiff Neipris filed a memorandum of complaint with Defendant NCC reporting Defendant Watson's discriminatory behavior, stating his actions made her feel uncomfortable and singled her out as a female.

84.     Defendant Bond was copied on Plaintiff Neipris' complaint. Defendants NCC and Bond failed to respond to Plaintiff Neipris' complaint.

85.     Multiple other NCC Officers, whom outranked the Plaintiffs at the time and held supervising roles, were aware of the sexually hostile, harassing and offensive environment created by Defendant Watson and failed to act or report Defendant Watson's conduct.

86.     Defendant NCC's failure to act is a complete acquiescence of Defendant Watson's conduct.

87.     In January of 2017, Defendant Meyer became the New Castle County Executive.

88.     Defendant Bond made it clear to Defendant Meyer he would only accept the position of Chief of Police if he could promote Defendant Watson to Lieutenant Colonel.

89.     Upon information and belief, Kathleen Jennings, while in the position of Chief Administrative Officer of New Castle County, advised Defendant Meyer not to promote Defendant Watson.

90.     Upon information and belief, former NCC Chief of Police Jack Cunningham advised Defendant Meyer not to promote Defendant Watson.

14

91.    Upon information and belief, other NCC sergeants advised Defendant Meyer not to promote Defendant Watson.

92.    Prior to promoting Defendant Bond to Chief of Police, Defendant Meyer knew there were issues and concerns surrounding Defendant Watson's behavior and conduct as a police officer, including but not limited to allegations of sexual harassment.

93.    Defendant Meyer promoted Defendant Bond to Chief of Police with full knowledge Defendant Watson would also be promoted in the midst of the allegations of sexual harassment and assault.

94.    Defendant Meyer failed to start any investigation or inquiry into the allegations against Defendant Watson before promoting Defendant Bond.

95.    On July 31, 2018, the Independent Times posted a blog publicly outing Defendants Watson and NCC. The blog reported numerous complaints to Defendant NCC regarding Defendant Watson's sexual harassment and assault of numerous female NCC officers and employees.

96.    On August 1, 2018, Plaintiff O'Sullivan again reported to now Chief of Police, Defendant Bond, that the allegations of sexual harassment and assault against Defendant Watson contained in the Independent Times post concerning numerous female employees were in fact true.

97.    In an attempt to prevent Plaintiff O'Sullivan from reporting Defendant Watson's sexual harassment, Defendant Bond threatened Plaintiff O'Sullivan by advising her if she went forward, she will only ever be known as a victim, which would dominate her career and reputation.

98.    Plaintiff O'Sullivan then asked Defendant Bond what he was going to do about these allegations of sexual harassment and assault against Defendant Watson. Defendant Bond again stated nothing and failed to conduct an investigation.

99.     After Plaintiff O'Sullivan's second report of sexual harassment and assault to Defendant Bond in August of 2018, stating the allegations in the media regarding Defendant Watson were in fact true, Defendant Bond took three weeks of vacation and made Defendant Watson Acting Chief of Police.

100.    During these three weeks, Defendant Watson had full control and authority over Plaintiffs as their commanding officer.

101.    Plaintiffs were again subjected to a severe and pervasive working environment perpetuated by Defendant Watson's control over each Plaintiff.

102.    On August 21, 2018, Defendant Watson was placed on paid administrative leave.

103.     Defendant Bond announced during a staff meeting Defendant Watson's last day of work would be August 31, 2018, but he would use his accrued vacation through September 2018, and would retire the beginning of October 2018.

104.    Defendant NCC, however, in fact permitted Defendant Watson to remain a county employee in good standing and use all of his vacation time until December 4, 2018, the day before his mandatory retirement.

105.    Plaintiff O'Sullivan attempted to file a New Castle County Professional Standards Complaint on August 8, 2018, regarding the sexual harassment and assault perpetrated by Defendant Watson.

106.    Defendant NCC continued to dissuade Plaintiff O'Sullivan from filing a complaint.

107.    The complaint of sexual harassment took Plaintiff O'Sullivan three weeks to file. Plaintiff O'Sullivan first tried to report her claims to Deloris Arrington in Human Resources. Ms. Arrington told Plaintiff O'Sullivan she could not hear her complaints and that she should report it to Defendant Bond.

16

108.     Plaintiff O'Sullivan knew she could not report to Defendant Bond because she had previously complained to him and he buried and ignored her complaint.

109.     Plaintiff O'Sullivan reported the sexual harassment she endured to Lieutenant Richard Dunning of the NCCPD Professional Standards Unit Command through her attorney at the time Ronald Stoner, Esquire. Plaintiff O'Sullivan was told again she had to report her complaints to Defendant Bond.

110.     On August 10, 2018, Defendant Bond issued a Departmental Memorandum stating in part Lieutenant Colonel Watson's contributions to this agency are commendable, and the Police Division extends its very best wishes to Defendant Watson in all of his future endeavors.

111.     On August 20, 2018, Plaintiff O'Sullivan filed her official sexual harassment complaint with Defendant Meyer, Defendant Phillips and Defendant NCC's Attorney Carol Dulin, Esquire.

**DEFENDANT NEW CASTLE COUNTY INTENTIONALLY NARROWS AND OBSTRUCTS THE INVESTIGATION INTO DEFENDANT WATSON AND TAMPERS WITH THE RESULTS OF THE INVESTIGATION TO ALLOW DEFENDANT WATSON TO RETIRE IN GOOD STANDING**

112.     On August 21, 2018, Defendant Watson was placed on paid administrative leave pending an investigation by the Wilmington Police Department.

113.     Defendant Bond told Sergeant ("Sgt.") Barry Mullins, Internal Affairs for the Wilmington Police Department, to narrow the scope of the investigation to just focus on Plaintiff O'Sullivan and to not contact or seek out any other victims.

114.     Plaintiff O'Sullivan was interviewed by Sgt. Mullins, of the Internal Affairs Unit of the Wilmington Police Department on August 31, 2018. Plaintiff O'Sullivan reported to Sgt. Mullins the incidents of sexual harassment and assault she endured by Defendant Watson beginning in 1996.

115.    Plaintiff O'Sullivan advised Sgt. Mullins she had the names of more victims and witnesses who were subjected to sexual harassment and/or a hostile work environment by way of Defendant Watson. Plaintiff O'Sullivan provided Sgt. Mullins with a list and contact information of an additional twenty-five to thirty names of victims of sexual harassment by way of Defendant Watson. Sgt. Mullins told Plaintiff O'Sullivan he was told by Defendant Bond to narrow the scope of the investigation to just focus on Captain O'Sullivan, and to not look for any other victims.

116.    On September 11, 2018, Plaintiff Davies was interviewed by Sgt. Mullins. Plaintiff Davies reported to Sgt. Mullins the incidents of sexual harassment and assault perpetuated by Defendant Watson.

117.    On September 27, 2018, Sgt. Mullins interviewed Plaintiff Scelsi. During this interview, Plaintiff Scelsi reported to Sgt. Mullins sexual harassment perpetuated by Defendant Watson.

118.    On October 24, 2018, Plaintiff Kane was interviewed by Sgt. Mullins. During this interview, Plaintiff Kane reported to Sergeant Mullins the sexual harassment perpetuated by Defendant Watson.

119.    On September 14, 2018, Sgt. Mullins interviewed Plaintiff Neipris. During this interview, Plaintiff Neipris reported to Sgt. Mullins the instances of sexual harassment she endured by way of Defendant Watson.

120.    On October 22, 2018, Sgt. Mullins interviewed Plaintiff Ellwein. During this interview, Plaintiff Ellwein reported to Sgt. Mullins the sexual harassment she endured by way of Defendant Watson.

121.    On December 4, 2018, four months after Plaintiffs' complaints of sexual harassment were made public, and one day before his mandatory retirement date, Defendant

Watson was interviewed by Wilmington Police Department. The undue delay in this investigation was to the result of Defendant Bond intentionally narrowing the scope and delaying the production of requested documents to stretch the investigation and further protect Defendant Watson.

122.    On December 5, 2018, the day after Defendant Watson was interviewed, Defendant Watson retired.

123.    On December 18, 2018, Defendant Bond intentionally misled Delaware Attorney General Matthew Denn when he issued and filed a letter of "Good Standing" regarding Defendant Watson's status with the New Castle County's Prothonotary Office.

124.    Defendant Bond falsely represented to Attorney General Matthew Denn and the general public that Defendant Watson separated from service in "Good Standing".

125.    Defendant Bond stated in the letter of Good Standing "based upon review, I feel he [Defendant Watson] is currently a retired police officer in good standing and is qualified to carry a concealed deadly weapon."

126.    To the contrary, at the time Defendant Bond authored Defendant Watson's letter of "Good Standing" Defendant Watson was the subject of a criminal investigation and subject to disciplinary action for allegations of sexual harassment and assault.

127.    In accordance with the Law Enforcement Officers' Safety Act and the Delaware equivalent statute, a qualified law enforcement officer may not be the subject of any disciplinary action.

128.    In accordance with New Castle County Separation Protocol an officer must not be under criminal investigation at the time of separation from the division to meet the definition of "Good Standing".

129.     Defendant Bond was at all times aware of these rules, regulations and statutes, when he falsely represented to the highest-ranking law enforcement official in the State of Delaware that Defendant Watson retired in "Good Standing"

130.     Defendants Meyer and Phillips were aware of this blatant disregard of New Castle County rules and policies and violation of the law.

131.     In February of 2019, Plaintiffs Davies, O'Sullivan, Scelsi, Kane, Ellwein and Neipris were told by Defendants Meyer and Phillips that they received Wilmington Police Department's preliminary report, which they had fully read.

132.     Defendants Meyer and Phillips lied to the Plaintiffs stating the investigation was not completed as Wilmington Police Department still needed to conduct additional interviews.

133.     Upon information and belief, Wilmington Police Department had submitted to Defendants Meyer and Phillips their final investigatory report in early February of 2019.

134.     Upon information and belief, Defendant NCC contacted Wilmington Police Department asking it to amend the sexual harassment report to reflect more favorably on Defendant Watson, Defendant Bond, and Defendant NCC. Upon information and belief, Wilmington Police Department refused to alter the report.

135.     On March 15, 2019, Plaintiffs O'Sullivan and Davies asked Defendant NCC for an update regarding Wilmington Police Department's investigation. Defendant NCC again lied to Plaintiffs O'Sullivan and Davies, telling them Wilmington Police Department's investigation was still ongoing, when the investigation was in fact complete.

136.     On May 3, 2019, the Fraternal Order of Police ("FOP") filed a system wide grievance stating that Defendants Bond and NCC violated numerous department policies and procedures during the investigation into Defendant Watson. Defendant Phillips, acting as Chief

Administration Officer, refused the grievance, stating it had no merit because the investigation was closed.

137.    On June 7, 2019, Plaintiffs provided Defendant Hojnicki, then Acting Public Safety Director, with complaints of sexual harassment and assault against Defendant Watson, as well as complaints of retaliation, hostile work environment, failure to investigate, and conspiracy against Defendants Meyer and Phillips.

138.    Defendant Hojnicki was directly told of the sexual harassment and assault perpetrated by Defendant Watson by Plaintiffs. Defendant Hojnicki was also advised of Plaintiffs complaints filed with the Office of Civil Rights and Public Trust against Defendants Bond, Meyer and Phillips in regards to their handling of the investigation into their complaints of sexual harassment and assault.

139.    Defendant Hojnicki sealed the complaints in an envelope, held onto the complaints for twelve days and never read them.

**FINDINGS OF THE INVESTIGATION**

140.    While Wilmington Police Department conducted the investigation, NCC Police Department, specifically the Internal Affairs Department, was tasked with determining whether there were any sustainable violations.

141.    On April 1, 2019, Lieutenant Richard Dunning from NCC Police Department contacted each Plaintiff individually advising them he had the final results of Wilmington Police Department's investigation. NCC received the final investigatory report from Wilmington Police Department on or about February 13, 2019, and waited over thirty days to advise Plaintiffs of that fact.

142.    Plaintiff O'Sullivan was informed that the charges of Sexual Harassment and Conduct Unbecoming and Conformance to laws were "Sustained" but no action against Defendant Watson would be taken because he retired and was no longer employed by Defendant NCC.

143.    Plaintiff Davies was informed that the charges of sexual harassment and assault were "Not Sustained" because Defendant NCC did not have a sexual harassment policy for the time period during which Plaintiff Davies was complaining. The charge of Conduct Unbecoming of an Officer was "Sustained" against Defendant Watson, but Plaintiff Davies was also informed no action would be taken because Defendant Watson had retired and was no longer employed by Defendant NCC.

144.    Plaintiff Scelsi was informed that the charges of sexual harassment and assault were "Not Sustained" because Defendant NCC did not have a sexual harassment policy for the time period during which Plaintiff Scelsi was complaining. The charge of Conduct Unbecoming of an Officer was "Sustained" against Defendant Watson, but Plaintiff Scelsi was also informed no action would be taken because Defendant Watson had retired in "Good Standing".

145.    Plaintiff Kane was informed that the charges of sexual harassment and Conduct Unbecoming of an Officer were "Sustained" against Defendant Watson based on her report, but nothing would be done because he retired and was no longer employed by Defendant NCC.

146.    Plaintiff Ellwein was informed that the charges of sexual harassment were "Not Sustained" because Defendant NCC could not find a sexual harassment policy for the time period for which Plaintiff Ellwein was complaining. The charge of Conduct Unbecoming of an Officer was "Sustained" against Defendant Watson, but Plaintiff Ellwein was also informed no action would be taken because Defendant Watson had retired in "Good Standing."

147.    Plaintiff Neipris was told "there is not enough evidence to prove a violation occurred or did not occur" by Defendant Watson and thus the charges were "classified as not sustained."

148.    Defendant NCC did not sustain several charges of sexual harassment against Defendant Watson by Plaintiffs Davies, Scelsi and Ellwein not because the sexual harassment did not occur, but because Defendant NCC could not purportedly find a sexual harassment policy to cover the time for which Plaintiffs complained. Defendant NCC concluded because there was no policy there could be no sustained charges.

149.    Defendant NCC had a sexual harassment policy in effect since 1997, therefore covering the time period for which Plaintiffs were victims of sexual harassment and assault.

150.    Failure to "locate" the policy was simply another act by Defendants NCC, Bond, Meyer and Phillips, to thwart the investigation and protect Defendants Watson, Bond and Meyer at all costs.

151.    Upon information and belief, Defendant NCC purposely failed to follow the findings of Wilmington Police Department's investigation and instead manufactured its own findings and conclusions.

152.    On June 7, 2019, Plaintiffs attempted to file their reports and complaints of sexual harassment and assault against Watson, as well as their complaints of retaliation, hostile work environment, failure to investigate, and conspiracy against Defendants Bond, Meyer and Phillips.

153.    Defendant Hojnicki was directly told of the sexual harassment and assault perpetrated by Defendant Watson by Plaintiffs.

154.     Plaintiffs asked Defendant Hojnicki to review each complaint and then consult with the Delaware Attorney General's office on steps to take regarding the hostile work environment and numerous violations of NCC policy and procedures.

155.     In response Defendant Hojnicki stated to Plaintiff's, [he] serves at the pleasure of the County Executive and [he] needed to figure out the best course of action for him and how he would be affected.

156.     Defendant Hojnicki sealed the complaints in an envelope, held onto the complaints for twelve days and never read them.

157.     In fact, Defendant Hojnicki gave the sealed envelope back to the Fraternal Order of Police Attorney, Anthony DelCollo, Esquire.

158.     In June of 2019, Plaintiffs each filed a complaint with the Delaware Department of Justice Office of Civil Rights and Public Trust against Defendants Meyer, Phillips, and Bond. Additionally, New Castle County Council requested the Delaware Attorney General investigate specific members of the New Castle County Police Department leadership.

159.     The Delaware Department of Justice found the allegations of misconduct to be credible and therefore, opened an investigation. As a result of the investigation dozens of witnesses and victims were interviewed and hundreds of pages of documents were reviewed.  The Delaware Department of Justice concluded the accusations from numerous victims "as well as corroborating information from other witnesses-were disturbing" and warranted further investigation into whether NCCPD has engaged in a pattern and practice of discriminatory conduct in violation of Delaware law.

160.     On June 19, 2019, Defendant NCC told Plaintiffs their complaints of sexual harassment and assault would not be investigated and NCC is not entertaining their complaints as

the harassment case was already closed and completed. Defendant NCC handed the sealed envelope containing Plaintiffs' accounts of sexual harassment, assault, hostile work environment, retaliation and conspiracy back to Mr. DelCollo.

161.   Since Defendant Watson's retirement in December of 2018, Defendant NCC has failed to interview or hire for the position of Lieutenant Colonel.

162.   Defendants NCC and Bond have willfully failed to interview Plaintiffs for the position of Lieutenant Colonel in direct retaliation for reporting sexual harassment, assault, and hostile work environment.

163.   As a direct result of the discriminatory and wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress, humiliation, anxiety, irreparable damage to their professional careers and economic loss.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiffs maintain the following legal claims against Defendants:

## COUNT I
### Discrimination Based on Sex in Violation of the Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et al.*)
### Against Defendant New Castle County

164.   The allegations of Paragraphs 1 through 163 are incorporated by reference as if fully restated herein.

165.   Defendant NCC employs fifteen or more employees and is an "Employer" as defined by 42 U.S.C. § 2000e(b).

166.   At all times relevant hereto, Plaintiffs were employed by Defendant NCC and are "Employees" as defined by 42 U.S.C. § 2000e(f).

167.    Plaintiffs received a Right to Sue letter from the EEOC on March 20, 2020. (Exhibit A). Plaintiffs have satisfied all statutory prerequisites for filing this action.

168.    Defendant NCC discriminated against Plaintiffs in the terms and conditions of their employment on the basis of their sex in violation of Title VII of the Civil Rights Act of 1964. Defendant NCC subjected Plaintiffs to disparate treatment based upon their sex including, but not limited to, subjecting them to sexual harassment and a hostile work environment and refusing to adequately investigate their claims of sexual harassment and discrimination.

169.    Plaintiffs were subjected to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature sufficient to constitute sexual harassment throughout their employment with Defendant NCC.

170.    Plaintiffs were subjected to sexual harassment beginning at the start of their employment with Defendant NCC which continued through Defendant Watson's retirement and Defendant NCC's faulty investigation of Plaintiffs' reports of sexual harassment and assault.

171.    Defendant NCC's actions stated above are sufficient to support a continuing violation of sexual harassment as they are series of separate acts that collectively constitute one unlawful employment practice.

172.    Plaintiffs were subjected to a hostile work environment perpetuated by Defendant Watson beginning at the start of their employment with Defendant NCC, which continued through Defendant Watson's "retirement" and Defendant's faulty investigation of their reports of sexual harassment. The discrimination and harassment had the purpose and effect of unreasonably interfering with Plaintiffs' work performance and creating an intimidating, hostile, and offensive working environment.

173.    Defendant NCC's actions stated above are sufficient to support a continuing violation of a hostile work environment claim as they are series of separate acts that collectively constitute one unlawful employment practice. The discrimination Plaintiffs endured were not isolated or sporadic incidents and therefore are part of the same unlawful employment practice.

174.    The following acts of Defendant NCC are sufficient to support a continuing violation under a theory of hostile work environment: Defendant NCC's suppression of Plaintiff O'Sullivan's complaint in 2018; Defendant NCC's promotion of Defendant Watson to Lieutenant Colonel in 2017 and Acting Chief in 2018 amid allegations of sexual harassment and assault; Defendant NCC's intentional interference to delay Wilmington Police Department's investigation to protect Defendant Watson; Defendant NCC's failure to investigate or discipline Defendant Watson and Bond; and Defendant NCC's failure to interview Plaintiffs for the position of Lieutenant Colonel.

175.    The discrimination and harassment endured by Plaintiffs were based upon Plaintiffs' sex.

176.    The discrimination and harassment were severe and pervasive, thus altering the condition of Plaintiffs' employment and creating an abusive work environment.

177.    Defendant NCC discriminated against Plaintiffs by imposing a hostile work environment upon Plaintiffs by condoning the conduct of its employees including the harassing conduct of Defendant Watson.

178.    Defendant NCC did not try to prevent the discriminatory and harassing behavior.

179.    Defendant acquiesced in the discriminatory and harassing conduct by creating and allowing to exist a hostile, intolerable, offensive and abusive workplace that a reasonable person would consider intimidating, hostile, or abusive.

180.    Defendant NCC has intentionally violated Plaintiffs' rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

181.    As a direct result of the discriminatory and wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress, humiliation, anxiety, irreparable damage to their professional careers and economic loss.

## COUNT II
### Violation of the Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et al.*) – Retaliation
### Against Defendant New Castle County

182.    The allegations of Paragraphs 1 through 181 are incorporated by reference as if fully restated herein.

183.    Defendant NCC employs fifteen or more employees and is an "Employer" as defined by 42 U.S.C. § 2000e(b).

184.    At all times relevant hereto, Plaintiffs were employed by Defendant NCC and are "Employees" as defined by 42 U.S.C. § 2000e(f).

185.    Plaintiffs received a Right to Sue letter from the EEOC on March 20, 2020. Plaintiffs have satisfied all statutory prerequisites for filing this action.

186.    Plaintiff O'Sullivan reported the sexual harassment, assault and hostile work environment created by Watson to Defendant NCC and Defendant Bond. Such complaints are a protected activity under Title VII of the Civil Rights Act of 1964.

187.    Plaintiffs Davies, Ellwein, Scelsi, Kane and Neipris reported the sexual harassment and assault they endured by way of Defendant Watson to Defendant NCC and the Wilmington Police Department. Such complaints are protected activity under Title VII of the Civil Rights Act of 1964.

188.   On November 1, 2019, Plaintiffs lodged a formal complaint with the EEOC regarding Defendants' harassing, discriminatory and retaliatory conduct. Such action is protected activity under Title VII of the Civil Rights Act of 1964.

189.   Defendant NCC has retaliated against Plaintiffs by intentionally delaying and narrowing the scope of the investigation into Plaintiffs complaints of sexual harassment and assault.

190.   Since Defendant Watson's retirement in December of 2018, Defendant NCC has failed to interview or hire for the position of Lieutenant Colonel.

191.   Defendants NCC and Bond have failed to interview Plaintiffs for the position of Lieutenant Colonel in direct retaliation for reporting sexual harassment, assault, and hostile work environment.

192.   Specifically, Plaintiffs O'Sullivan, Davies, Scelsi and Neipris were retaliated against and subjected to an adverse employment action as a result of Defendant NCC's failure to fill the position of Lieutenant Colonel, therefore stifling any promotional opportunities Plaintiffs may have.

193.   To date, Defendant NCC has failed to fill the position of Lieutenant Colonel.

194.   Plaintiffs suffered additional adverse employment actions when Defendant NCC created a sexually charged and discriminatory hostile work environment, which has a direct effect on their ability to perform their job duties.

195.   As a direct result of the discriminatory and wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress, humiliation, anxiety, irreparable damage to their professional careers and economic loss.

<u>**COUNT III**</u>
**Violation of 42 U.S.C. §1983 –**
**Sexual Harassment and Hostile Work Environment**
**Against All Defendants**

196.    The allegations of Paragraphs 1 through 195 are incorporated by reference as if fully restated herein.

197.    Defendants' discriminatory conduct, as set forth herein, deprived Plaintiffs of equal protection under the law as guaranteed by the Fourteenth Amendment.

198.    The incidents of sexual harassment and assault as described in the above paragraphs had the effect of substantially interfering with Plaintiffs' work performance by creating a hostile, intimidating and offensive working environment amounting to unlawful sex discrimination in violation of Plaintiffs' right under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

199.    Defendants NCC, Bond, Watson, Meyer, Phillips and Hojnicki violated the rights secured to Plaintiffs by 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to be free from sex discrimination in public employment in that, having actual or constructive knowledge of the sexual harassment and assault committed by Defendant Watson, acted with deliberate indifference to Plaintiffs' rights, in failing to intervene to stop the unlawful conduct, in failing to properly supervise or control Defendant Watson, and in failing to remedy Defendant Watson's conduct after they learned about it.

200.    Defendant NCC maintained a policy, custom and practice of intentional sex discrimination as well as a policy of condoning and promoting a sexually hostile work environment and refusal to adequately investigate claims of sexual harassment and assault. Defendant NCC's policy, custom and practice have deprived Plaintiffs of their rights protected by Title VII and the Fourteenth Amendment.

201.    Defendants Bond, Watson, Meyer, Hojnicki and Phillip's discriminatory actions are representative of an official policy or custom of Defendant NCC and/or taken by an official with final policy making authority.

202.    Defendant Watson, individually and in his official capacity, acted with deliberate indifference to Plaintiffs' constitutional rights in that he intentionally and continuously sexually harassed and assaulted Plaintiffs during their employment with Defendant NCC for a period of over twenty years. Defendant Watson knew from early on he could get away with his discriminatory behavior as Defendants NCC, Bond, Phillips, Hojnicki and Meyers condoned his behavior.

203.    Defendant Bond knew of Defendant Watson's discriminatory conduct as it was reported to him on multiple occasions. Defendant Bond, individually and in his official capacity, acted with deliberate indifference and failed to report Defendant Watson's discriminatory conduct, thereby acquiescing to his conduct. This allowed Plaintiffs to be continually sexually harassed and subjected to a hostile work environment. By Defendant Bond's official position and duties as Lieutenant, Captain, Lieutenant Colonel and Chief of Police, he was empowered and responsible to take corrective actions to ensure that such illegal treatment did not continue to occur.

204.    Defendant Bond acted with deliberate indifference and intentionally interfered with the investigation into Plaintiffs' claims by narrowing the scope of the investigation into just Plaintiff O'Sullivan's claims and by delaying requested documents in order to prolong the investigation to protect Defendant Watson.

205.    Defendant Meyer, individually and in his official capacity, acted with deliberate indifference to Plaintiffs' rights by failing to investigate credible allegations of sexual harassment and assault reported to him in or around 2017 regarding Defendant Watson. Defendant Meyer

promoted Defendant Bond to Chief of Police with full knowledge Defendant Watson would also be promoted in the midst of the allegations of sexual harassment and assault. Defendant Meyer permitted Defendant Watson to retire in Good Standing instead of terminating him.

206.    Defendant Phillips, individually and in her official capacity, acted with deliberate indifference to Plaintiffs' rights when she lied to Plaintiffs stating the investigation into their complaints was not completed as Wilmington Police Department still needed to conduct follow up interviews. Upon information and belief, Wilmington Police Department completed its investigation. Upon information and belief, Defendant Phillips destroyed documents regarding Defendant Watson's conduct.

207.    Defendant Phillips acted with deliberate indifference to Plaintiffs' right when she refused Plaintiffs grievance filed by the Fraternal Order of Police on May 3, 2019, stating it had no merit because the investigation was closed.

208.    Defendant Hojnicki, individually and in his official capacity, acted with deliberate indifference to Plaintiffs' rights by failing to respond to Plaintiffs' complaints of sexual harassment and assault. Plaintiffs provided Defendant Hojnicki with complaints of sexual harassment and assault against Defendant Watson as well as complaints of retaliation, hostile work environment, failure to investigate and conspiracy against Defendants Bond, Meyer and Phillips. Defendant Hojnicki sealed the complaints, held onto them for twelve days, never read them and handed them back to FOP attorney Anthony DelCollo, Esquire.

209.    Defendants' violation of the United States Constitution included policies, practices, and/or customs, to treat female employees less favorably than male employees and to promote a policy of sex discrimination, which was committed, directed, implemented and/or ratified by

officials of Defendant NCC in supervisory capacities with policymaking and decision-making authority, including Defendants Bond, Watson, Meyer, Hojnicki and Phillips.

210.    As a direct and proximate result of Defendants' acts and conduct which caused Plaintiffs to be denied equal protection under the law, Plaintiffs have suffered those injuries damages and losses alleged herein and have incurred attorney's fees.

211.    As a direct result of the discriminatory and wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress, humiliation, anxiety, irreparable damage to their professional careers and economic loss.

## COUNT IV
### Violation of 42 U.S.C. §1983 -Failure to Train/Supervise
### Against Defendants NCC, Bond, Meyer, Phillips, and Hojnicki

212.    The allegations of Paragraphs 1 through 211 are incorporated by reference as if fully restated herein.

213.    Defendants NCC, Bond, Meyer, Phillips and Hojnicki maintained a policy, custom and practice of condoning and promoting a sexually hostile work environment through the failure to adequately supervise and train its employees and subordinates on how to adequately investigate and prevent claims of sexual harassment and assault.

214.    Defendants NCC acted with deliberate indifference to Plaintiffs' constitutional rights when it had actual knowledge of the sexually discriminatory environment perpetuated by Defendant Watson and failed to establish appropriate policies and procedures and appropriately train and supervise its employees, namely Defendants Bond, Watson, Meyer, Phillips and Hojnicki on the investigation and prevention of sexual harassment and assault in the workplace.

215.    Upon notice of the sexual harassment and assault of Plaintiffs, Defendants Bond, Meyer, Phillips and Hojnicki had a duty to properly investigate Plaintiffs' report of sexual assault

and harassment and prevent any further sexual harassment and assault. Instead, due to Defendant NCC's failure to train and supervise Defendants Bond, Meyer, Phillips and Hojnicki, failed to take any remedial action and thereby consciously acquiesced to Defendant Watson's conduct.

216.    Defendant Bond, individually and in his official capacity, acted with deliberate indifference to Plaintiffs' constitutional rights when he failed to appropriately train and supervise his subordinates on the investigation and prevention of sexual harassment and assault in the workplace. Defendant Bond failed to supervise Defendant Watson, allowing him to continue to sexually harass and assault Plaintiffs.

217.    Defendant Meyer, individually and in his official capacity as County Executive acted with deliberate indifference to Plaintiffs' constitutional rights when he failed to appropriately train and supervise his subordinates on the investigation and prevention of sexual harassment and assault in the workplace, namely Defendants Bond, Watson, Phillips and Hojnicki. Upon notice of the sexual harassment and assault of Plaintiffs, Defendant Meyer had a duty to investigate Plaintiffs report of sexual harassment and assault and supervise its employees to ensure a proper investigation was carried out into Plaintiffs' reports of sexual assault and harassment. Instead, Defendant Meyer failed to take any action and thereby consciously acquiesced to Defendant Watson's conduct.

218.    Defendant Phillips, individually and in her official capacity, acted with deliberate indifference to Plaintiffs' constitutional rights when she failed to appropriately train and supervise her subordinates on the investigation and prevention of sexual harassment and assault in the workplace. Upon notice of the sexual harassment and assault of Plaintiffs, Defendant Phillips had a duty to investigate Plaintiffs' reports and supervise its employees to ensure a proper investigation

was carried out into Plaintiffs reports of sexual assault and harassment. Instead, Defendant Phillips failed to take any action and thereby consciously acquiesced to Defendant Watson's conduct.

219.    Defendant Hojnicki, individually and in his official capacity acted with deliberate indifference to Plaintiffs' constitutional rights when he failed to appropriately train and supervise his subordinates on the investigation and prevention of sexual harassment and assault in the workplace. Upon notice of the sexual harassment and assault of Plaintiffs, Defendant Hojnicki had a duty to investigate Plaintiffs' reports and supervise its employees to ensure a proper investigation was carried out into Plaintiffs' reports of sexual assault and harassment. Instead, Defendant Hojnicki failed to take any action and thereby consciously acquiesced to Defendant Watson's conduct.

220.    Defendants NCC, Bond, Meyer, Phillips and Hojnicki intentionally failed to take measures reasonably calculated to end or mitigate that harassment of female officers, including Plaintiffs, and their failure to enforce effective discipline against a harasser, protect female officers, and eliminate or curtail sexual harassment against them has been so widespread and well-settled as to constitute the de facto equivalent of a formal policy of sex discrimination.

221.    Multiple policy makers, including Defendants Bond, Meyer, Phillips and Hojnicki, as well as other high-ranking members of the New Castle County Police Department, implemented a custom and policy of complacency by looking the other way and failing to take any corrective action to prevent sexual harassment of its female officers.

222.    Defendants were complicit in their actions and thereby created a custom and policy of acceptance of sexual harassment against female officers.

223.    Defendants Bond, Meyer, Phillips and Hojnicki created a policy and custom to dissuade victims of sexual harassment from coming forward by failing to take any corrective action against harassers or those employees who failed to report sexual harassment.

224.    Through its polices, practices, and or customs, Defendants deprived Plaintiffs of their rights to substantive due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution, and 42 U.S.C. §1983.

225.    As a direct and proximate result of Defendants' acts and conduct which caused Plaintiffs to be denied equal protection under the law, Plaintiffs have suffered those injuries damages and losses alleged herein and have incurred attorney's fees.

226.    As a direct result of the discriminatory and wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress, humiliation, anxiety, irreparable damage to their professional careers and economic loss.

**COUNT V**
**Violation of 42 U.S.C. §1983**
**Substantive Due Process - Abuse of Power**
**Against Defendants Bond, Watson, Meyer and Phillips**

227.    The allegations of Paragraphs 1 through 226 are incorporated by reference as if fully restated herein.

228.    Defendant Bond intentionally and blatantly abused the official power placed upon him in his official capacity as, Lieutenant, Captain, Lieutenant Colonel and Chief of Police of NCC when in a position of power over Plaintiffs, failed to take any action to investigate or prevent the sexual harassment and assault they endured by Defendant Watson.

229.    Defendant Bond abused the official power placed upon him by intentionally delaying and narrowing Wilmington Police Department's investigation into Plaintiffs' claims of sexual harassment and assault.

230.    Defendant Watson intentionally and blatantly abused the official power placed upon him in his official capacity as Sergeant, Lieutenant, Captain, Lieutenant Colonel and Acting Chief, by using his position of power and authority over Plaintiffs to sexually discriminate and harass them during their employment with NCC.

231.    Defendant Hojnicki intentionally and blatantly abused the official power placed upon him in his official capacity as Public Safety Officer when presented with complaints of sexual harassment and assault by Plaintiffs, willfully failed to read the complaints and take action.

232.    Defendant Meyer intentionally and blatantly abused the official power placed upon him in his official capacity as the NCC County Executive in using his position of power to promote Defendant Watson despite multiple allegations of sexual assault and harassment against him.

233.    Defendant Phillips intentionally and blatantly abused the official power placed upon her in her official capacity as Chief Administrative Officer when she denied Plaintiffs May 3, 2019, grievance stating it had no merit. Upon information and belief, Defendant Phillips abused the official power placed upon her when she destroyed documents relating to Defendant Watson's conduct.

234.    Defendants Bond, Meyer, and Phillips knew the sexually harassing nature of the ongoing pattern of Defendant Watson's outrageous misconduct described above, and having the power, authority, and duty to correct these conditions, willfully, deliberately, and with reckless disregard of Plaintiffs' civil rights, failed to act to prevent the harm to Plaintiffs.

235.     As a direct and proximate result of Defendants Bond, Watson, Meyer, and Phillips' intentional and malicious acts, Plaintiffs suffered damages in connection with the deprivation of their constitutional and statutory rights.

236.    As a direct result of the discriminatory and wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress, humiliation, anxiety, irreparable damage to their professional careers and economic loss.

**COUNT VI**
**Violation of 42 U.S.C. §1983**
**Procedural Due Process - Abuse of Process**
**Against Defendants NCC and Bond**

237.    The allegations of Paragraphs 1 through 236 are incorporated by reference as if fully restated herein.

238.    Defendant Bond intentionally interfered with Wilmington Police Department's investigation into Plaintiffs claims of sexual harassment and assault.

239.    Defendant Bond told Wilmington Police Department to narrow the scope of its investigation into just Plaintiff O'Sullivan and also delayed the production of requested documents to stretch the investigation and further protect Defendant Watson.

240.    Upon information and belief, Defendant NCC contacted Wilmington Police Department asking it to amend the sexual harassment report to reflect more favorably on Defendant Watson, Defendant Bond, and Defendant NCC. Upon information and belief, Wilmington Police Department refused to alter the report.

241.    The actions of Defendants NCC and Defendant Bond as described herein constitute an abuse of process, and have caused and will continue to cause Plaintiffs *inter alia* severe emotional distress.

242.    As a direct result of the discriminatory and wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress, humiliation, anxiety, irreparable damage to their professional careers and economic loss.

## COUNT VII
## Breach of the Implied Covenant of Good Faith and Fair Dealing Against All Defendant New Castle County

243.   The allegations of Paragraphs 1 through 242 are incorporated by reference as if fully restated herein.

244.   Every contract, whether oral or written, express or implied, has a covenant to the effect that neither party to the contract will do anything in bad faith to prevent the other party to the contract from enjoying the benefits of the contract. This is known as the implied covenant of good faith and fair dealing, and this covenant applies to the employment agreement between Plaintiffs and Defendant NCC.

245.   Defendant NCC breached the covenant of good faith and fair dealing by condoning and perpetuating discriminatory conduct and sexual harassment.

246.   Defendant NCC's breach of the implied covenant of good faith and fair dealing has damaged Plaintiffs financially and professionally.

247.   As a direct result of the discriminatory and wrongful conduct of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress, humiliation, anxiety, irreparable damage to their professional careers and economic loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief in favor of Plaintiffs and against Defendants:

A.   Declare the conduct by Defendants to be in violation of Plaintiffs' statutory rights and common law rights.

B.   Award Plaintiffs all damages including but not limited to consequential damages, lost wages, salary, employment benefits, back pay, front pay, pre and

post judgement interest, equity, liquidated damages, and any or all pecuniary damages.

C.   Award Plaintiffs all compensation due as a result of Defendants' violations herein.

D.   Award Plaintiffs all compensatory damages including those damages for emotional distress, humiliation and mental anguish.

E.   Award Plaintiffs liquidated damages.

F.   Award Plaintiffs all attorney's fees, costs and expenses available under the law.

G.   Award Plaintiffs punitive damages to deter the Defendants and others from engaging in conduct similar to that which formed the basis of the lawsuit.

H.   Award Plaintiffs pre and post judgment interest at the legal rate.

I.   Any and all such other relief as the Court deems appropriate under the circumstances.


                         **ALLEN & ASSOCIATES**
                         */s/ Michele D. Allen*
                         Michele D. Allen (#4359)
                         Emily A. Biffen (#6639)
                         4250 Lancaster Pike Suite 230
                         Wilmington, DE 19805
                         302-234-8600
                         302-234-8602 (fax)
                         michele@allenlaborlaw.com
                         emily@allenlaborlaw.com
                         *Attorneys for Plaintiffs*

Dated: June 17, 2020